**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY JACKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 12 CV 4521** |
| **v.** | ) | |
| | ) | **Magistrate Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Anthony Jackson ("Jackson" or "claimant") brings this motion for summary judgment [20] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Jackson's claim for supplemental security income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. § 1382c(a)(3)(A). The Commissioner filed a cross-motion for summary judgment [24] asking this Court to uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, the claimant's motion for summary judgment is granted in part and denied in part, and the Commissioner's cross-motion for summary judgment is denied. This matter is remanded for further proceedings consistent with this Opinion.

**I.     BACKGROUND**

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as defendant in this suit.

## A.    Procedural History

Jackson filed his application for SSI on April 21, 2009.  (R. 151-56.)  He alleges that he has been disabled since October 25, 2007 due to seizure activity, sarcoidosis, depression, and hypertension.[2]  (R. 151, 181.)  His application was denied initially on August 12, 2009, and again on December 10, 2009, after a timely request for reconsideration.  (R. 61-68, 71-74.)  On January 6, 2010, Jackson filed a request for a hearing.  (R. 76.)  On November 22, 2010, Jackson appeared at his hearing, albeit late, and testified before ALJ Kimberly S. Cromer, as did Medical Expert Dr. Carl Leigh and Vocational Expert Michelle Peters.  (R. 31-58.)

On January 24, 2011, the ALJ issued a decision denying Jackson's SSI claim. (R. 15-30.)  Jackson filed a timely request for review with the Appeals Council.  (R. 14, 149.)  On May 3, 2012, the Appeals Council denied Jackson's request for review, at which time the ALJ's decision became the final decision of the Commissioner.  (R. 1-6); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  Jackson subsequently filed this action in the District Court and the parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c) [13].

## B.    Medical Evidence

### 1.    Treating Physicians

---

[2] Sarcoidosis is a disease of unknown cause that leads to inflammation of the body's organs, particularly the lymph nodes, lungs, liver, eyes, skin, or other tissues.  Symptoms of general discomfort often occur and include fatigue, fever, joint achiness or pain, overall feelings of discomfort, and weight loss.  Skin symptoms include hair loss, raised red skin sores, rashes, and scars that become raised or inflamed.  Nervous system symptoms may include headaches, seizures, and weakness on one side of the face.  Eye symptoms include burning, discharge from the eye, dry eyes, itching, pain, and vision loss. Sarcoidosis, U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/ency/article/000076.htm (last visited August 16, 2013).

The record reveals that Jackson was first diagnosed with sarcoidosis in 1998 with "eye and skin findings." (R. 272.) On October 12, 2007, the claimant was admitted to West Suburban Hospital for grand mal seizure activity. (R. 335.) He reported smoking a pack of cigarettes every day prior to his admission and regularly snorting heroin, the last time on the morning he was admitted. (R. 279, 335.) Upon admission, Dr. Laarni Pae observed that Jackson had an unstable gait and problems experiencing sensation on his right side. (R. 335.) According to emergency room notes, Jackson had two seizure episodes while in the ER. (R. 335, 339, 342-43.)

An MRI of the claimant's brain showed a solitary, one centimeter, focal enhancement lesion surrounded by edema. (R. 318, 356-57.) A CT scan of the chest and abdomen revealed subcarina adenopathy, precarinal adenopathy, multiple lung calcified small pulmonary nodules in both lung fields, and enlarged retroperitoneal lymph nodes and periatoric lymph nodes. (R. 356, 363-64.) On October 20, 2007, Dr. Isoken Koko examined Jackson. (R. 356-57.) On physical examination, Jackson looked well, alert, and oriented, and was not in any respiratory distress. (R. 357.) The examination was otherwise unremarkable. (*Id.*) However, based on the MRI results, Dr. Koko recommended transfer to a different hospital for a neurosurgical evaluation with a possible biopsy or resection of the brain lesion. (*Id.*)

On October 20, 2007, Jackson was discharged from West Suburban Hospital and transferred to John H. Stronger, Jr. Hospital of Cook County ("Stroger") for further evaluation. (R. 269.) While at Stroger, Jackson did not show any neurologic deficit or new episodes of seizures. (*Id.*) At times, he did demonstrate decreased memory and difficulties tandem walking. (R. 280-81, 289.) The neurosurgery department evaluated

3

Jackson and determined that no further surgical intervention was required. (R. 269.) He was discharged on October 25, 2007 and advised to continue taking Prednisone and Dilantin (or Phenytoin) for seizure control. (*Id.*) He was also advised to follow-up with an MRI in four to six weeks, presumably because requests for an inpatient MRI were denied. (R. 269, 291.)

On December 17, 2007, Jackson returned to West Suburban Hospital complaining of dizziness and feeling like a seizure was coming on. (R. 313.) He admitted to heroin use. (R. 316.) Jackson was given Dilantin after it was determined that his Dilantin level was low. (R. 311-12.) Jackson was discharged the same day and advised to return if his symptoms worsened. (R. 311.)

On December 24, 2008, Jackson was seen in the Pulmonary Clinic at Stroger for his history of sarcoidosis. (R. 410-12.) He denied lung problems due to sarcoidosis, but explained that he has suffered eye problems. (R. 410.) He stated that he was taking Prednisone on and off and Dilantin for seizure control. (*Id.*) A physical examination was unremarkable. (R. 411.) The examining physician recommended a pulmonary function test and a chest CT. (*Id.*)

On January 21, 2009, Jackson was admitted to St. Anthony's Hospital after suffering two seizures at Cook County Jail. (R. 392.) He was tachycardic and had a small laceration on his left tongue. (R. 393.) A CT showed a left parietal brain lesion. (R. 394.)

On May 4, 2009, Jackson presented to Holy Cross Hospital complaining of dizziness and right leg numbness, the feelings he gets prior to a seizure. (R. 469.) Treatment notes reveal that a nurse witnessed a seizure during his time at Holy Cross.

4

(R. 474.)  Lab results show Jackson had a normal Dilantin range, but a below

therapeutic Tegretol (or Carbamazepine) range.  (R. 486.)

On July 24, 2009, Jackson sought treatment at Provident Hospital for

dehydration and epilepsy.  (R. 448.)  On July 27, 2009, Jackson experienced seizure

activity while in the waiting room at Stroger.  (R. 442.)  He was taken to the emergency

department where he suffered a repeat seizure. (R. 442-43.)  His Tegretol and Dilantin

levels were low, but Jackson denied non-compliance with medications.  (R. 443.)  He

admitted to "snorting two bags of heroin."  (*Id.*)  During his admission, Jackson was

restarted on his anti-seizure medications and consulted about drug abuse.  (*Id.*)  A CT

scan revealed no acute changes.  (*Id.*)

At a follow-up appointment on July 31, 2009, Jackson's physician assessed

sarcoidosis, possible hepatitis B, uncontrolled hypertension, and substance abuse after

an unremarkable physical exam.  (R. 459-60.)

On October 6, 2009, Jackson experienced a grand mal seizure in his home,

another in the presence of the responding emergency medical services unit, and a third

seizure upon admission to Holy Cross hospital.  (R. 490-91, 494.)  Upon admission, he

was tachycardic and unsteady on his feet.  (R. 489-90.)  A physical exam revealed

normal findings.  (R. 494.)  Again, his Dilantin level was normal, but his Tegretol range

was below normal range.  (R. 500.)  Later that month, Jackson presented to Provident

Hospital expressing concern that he may have a seizure.  (R. 504.)  On November 5,

2009, Jackson returned to Provident for seizure activity.  (R. 526.)  He was advised to

take his medications regularly.  (*Id.*)

Records from the University of Chicago Medical Center reveal a normal

electrocardiogram on June 9, 2010 and a normal laboratory study of cerebrospinal fluid on June 11, 2010.  (R. 532, 535.)

### 2.  State Agency Consultants

On February 6, 2008, the claimant attended an internal medicine consultative examination for the Bureau of Disability Determination Services ("DDS") conducted by Dr. Norma Villanueva.  (R. 369-77.)  Jackson described a history of seizures, blurred vision, and high blood pressure.  (R. 369-70.)  Jackson admitted to smoking one pack of cigarettes per day, but denied current alcohol or marijuana use.  (R. 370.)

Upon examination, Jackson was 69.5 inches and weighed 222.6 pounds.  (R. 370.)  His blood pressure was 152/98.  (*Id.*)  His pulse was eighty-eight beats per minute and regular while his respiratory rate was eighteen and unlabored.  (*Id.*)  Dr. Villanueva observed dark pigmented spots on both lower extremities and described Jackson's skin as dry and scaly.  (*Id.*)  Jackson had decreased breathing sounds in his lungs, but no wheezing.  (*Id.*)  Jackson appeared sleepy and had slight difficulty with squatting and the heel/toe walk.  (*Id.*)  Jackson's grip strength and dexterity were normal bilaterally and he exhibited normal range of motion.  (R. 372-75.)  Lab results revealed a low Dilantin level.  (R. 377.)  Dr. Villanueva's assessed sarcoidosis affecting the eyes and lungs, seizures secondary to the spread of sarcoidosis, and hypertension.  (R. 371.)

On February 22, 2008, Dr. David Hillman conducted an ophthalmology consultative examination for DDS.  (R. 378-82.)  Jackson denied cataracts, glaucoma, or prior ocular surgery.  (R. 378.)  He acknowledged using eye drops for the past several years and a topical steroid that he used infrequently.  (*Id.*)  Upon examination, Dr. Hillman diagnosed Jackson with a refractive error, uveitis secondary to sarcoidosis,

which appeared inactive at the time, and severe generalized constriction.  (*Id.*)

However, Dr. Hillman felt the decreased visual field measurements seemed inconsistent

with the exam because Jackson walked through the hallway and examining room

consistent with normal visual fields.  (*Id.*)

On March 11, 2008, Dr. Calixto Aquino completed a Physical Residual Functional

Capacity  ("RFC") Assessment of the claimant.  (R. 383-90.)  Dr. Aquino determined

that Jackson could occasionally lift and/or carry fifty pounds, and frequently lift and/or

carry twenty-five pounds; could sit, stand, and/or walk with normal breaks for about six

hours in an eight-hour workday; and had an unlimited ability to push and pull.  (R. 384.)

Dr. Aquino further concluded that Jackson could never climb ladders, ropes, or scaffolds

due to his seizure disorder.  (R. 385.)  Jackson did not have any manipulative or

communicative limitations.  (R. 386-87.)  However, Dr. Aquino did note visual

limitations, including limited far acuity and limited accommodation due to uveitis

secondary to sarcoidosis.  (R. 386.)  Dr. Aquino also found Jackson to have certain

environmental limitations as a result of his sarcoidosis and climbing restrictions.  (R.

387.)  Specifically, he concluded that Jackson should avoid concentrated exposure to

fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and

heights.  (*Id.*)  In the additional comments section, Dr. Aquino acknowledged a history of

seizures, but noted Jackson's low Dilantin levels, which he believed evidenced non-

compliance.  (R. 390.)

On July 20, 2009, Dr. Mahesh Shah conducted a second internal medicine

consultative examination for DDS.  (R. 421-25.)  At the time of the examination, Jackson

complained of blurred vision, high blood pressure, a history of sarcoidosis, and

seizures, usually once or twice a month.  (R. 421.)  Jackson claimed that during

seizures, he sometimes bites his tongue or hits his head on the ground.  (*Id.*)  He

explained that he injured his left shoulder during a seizure, causing pain and an inability

to lift his left arm above his head.  (R.  422.)  He also explained that he became

depressed while in prison, but denied suicidal ideation.  (*Id.*)  He denied alcohol or drug

use, claiming he quit in 2008.  (*Id.*)

Upon examination, Jackson weighed 239 pounds and Dr. Shah noted he was

"mildly obese."  (R. 422-23.)  His blood pressure was 110/84.  (*Id.*)  His pulse was

regular at seventy-seven beats per minute and his respiratory rate was eighteen and

unlabored.  (*Id.*)  He had 20/40 corrected vision in both eyes.  (R. 423.)  Claimant's skin

was described as normal.  (R. 422.)  He had full range of motion of all joints of the upper

and lower extremities, however his left shoulder had marked tenderness.  (R. 423.)  He

had no difficulty moving around the office or sitting or laying on the examination table.

(R. 422.)  Finger grasp and hand grip were unimpaired bilaterally.  (R. 423.)  Fine and

gross manipulations were intact.  (*Id.*)  A mini-mental status examination was fairly

unremarkable.  (R. 424.)  Lab results revealed that Jackson's Dilantin level was within

the normal therapeutic range, but that his Tegretol level was below the normal range.

(R. 425.)

Dr. Shah assessed a history of seizures, not well-controlled, a history of

sarcoidosis in the brain, which could have caused the seizures, high blood pressure,

under good control, and depression.  (*Id.*)

Russell Taylor, Ph.D., completed a Psychiatric Review Technique on July 24,

2009.  (R. 427-40.)  He found no medically determinable mental impairments.  (R. 427,

439.)

On August 3, 2009, Dr. Richard Bilinsky completed another Physical RFC Assessment of Jackson.  (R. 451-58.)  Dr. Bilinsky concluded that Jackson could occasionally lift and/or carry up to twenty pounds, and frequently lift and/or carry up to ten pounds; could sit, stand and/or walk with normal breaks for about six hours in an eight-hour workday; and had limited ability to push and/or pull in his upper extremities due to a decreased range of motion and tenderness in his left shoulder.  (R. 452.)  Dr. Bilinsky further found that claimant could never climb ladders, ropes, or scaffolds due to his seizure disorder.  (R. 453.)  Jackson was also limited in reaching all directions, including overhead, as a result of his left shoulder, but he had no other manipulative limitations.  (R. 454.)  While Jackson did not have any visual or communicative limitations, Dr. Bilinsky noted that he was subject to environmental limitations and should avoid concentrated exposure to hazards such as machinery and heights due to his history of seizure disorder.  (R. 454-55.)  Dr. Bilinsky determined that Jackson's allegations were partially credible, but noted a lack of evidence regarding any treatment for depression.  (R. 458.)

On December 9, 2009, Dr. Towfig Arjmand affirmed Dr. Bilinsky's RFC assessment.  (R. 522.)  In doing so, he noted that a recent exam was unremarkable, that his medication levels were sub-therapeutic, and that his most recent seizure was due to continued noncompliance with medication.  (*Id.*)

### C.    Medical Expert's Testimony

As explained below, Jackson arrived forty minutes late to the hearing before the ALJ.  As a result, Medical Expert ("ME") Dr. Carl Leigh testified first.  The ALJ asked the

ME to explain what medical conditions the claimant has had since October 25, 2007, the alleged onset date. (R. 35.) The ME explained that claimant suffers from a seizure disorder, primarily of the grand mal type, and was known at times to bite his tongue. (*Id.*) The seizures were not well controlled by medication. (*Id.*) The ME testified that at the time of the second consultative examination in July of 2009, Jackson's Dilantin (Phenytoin) level was within the normal therapeutic range. (*Id.*) However, his Tegretol (Carbamazepine) level was below the therapeutic range. (*Id.*) This suggested to Dr. Leigh that Jackson may have some abnormalities or variances in processing Tegretol or that it was simply too expensive for him to purchase and take on a regular basis. (*Id.*) The ME pointed to other examples in the record when the Dilantin level was within therapeutic range, but the Tegretol level was less than therapeutic (*see* R. 486, 500), thus highlighting an apparent contradiction as to whether the claimant was in fact non-compliant with his medication as the DDS reviewing physicians opined. (R. 35-36.) Although Dr. Leigh contemplated that the DDS physicians could be correct in assuming that Jackson was non-compliant based on the low Tegretol level, he again cautioned that the low level was not necessarily indicative of non-compliance. (R. 36.)

Dr. Leigh testified that claimant also suffers from decreased range of motion of the left shoulder after falling on it during a seizure. (R. 36.) In Dr. Leigh's opinion, the diminished range of motion is a permanent abnormality. (*Id.*)

Dr. Leigh also testified as to Jackson's history of sarcoidosis involving the neurological system, especially the brain, and his skin, proven by biopsies of his neck and thigh. (R. 36.) The ME further testified that the claimant suffers from hypertension for which he takes medication. (*Id.*) He found no evidence of end organ damage from

the hypertension.  (*Id.*)

The ALJ then asked whether the claimant's medical impairments, either individually or in combination, met any of the Commissioner's medical listings for disability.  (R. 36-37.)  The ME responded that claimant's impairments did not reach listing level, especially considering the infrequency of his seizures.  (R. 37.)

However, the ME did acknowledge that Jackson's impairments limit his ability to function in a work setting.  (R. 37.)  Specifically, the ME testified that the claimant should be limited to occasionally lifting and carrying twenty pounds, but could frequently lift ten pounds with his dominant right upper extremity.  (R. 37-38.)  He said Jackson had no limitations on standing, walking or sitting, but could only occasionally push and pull with his left upper extremity.  (R. 38.)  Claimant should avoid all hazardous, unprotected heights and machinery, and could never crawl, climb ladders, ropes, or scaffolds.  (*Id.*)  However, he stated that Jackson could climb ramps and stairs, stoop, kneel, and crouch on a frequent basis.  (*Id.*)  Dr. Leigh added that Jackson could never reach overhead with the left upper extremity, but could reach in other directions occasionally.  (*Id.*)  In Dr. Leigh's opinion, Jackson would have no problem gripping, grasping, handling, or fingering.  (*Id.*)

On the whole, the ME generally agreed with Dr. Bilinsky's RFC assessment, but noted his own opinion was more restrictive regarding Jackson's ability to reach and his need to avoid hazardous heights, machinery, and commercial driving.  (R. 38-39.)  Lastly, the ME told the ALJ that Jackson's medical impairments reached severity on April 20, 2009.  (R. 39.)

Claimant's attorney then asked the ME whether Jackson's liver function could be

attributed to Hepatitis B.  (R. 40.)  The ME explained that he did not look into this issue because the Hepatitis diagnosis was presumptive, without any lab confirmation.  (R. 40-41.)  Next, claimant's attorney asked the ME which body systems Jackson's sarcoidosis affects.  (R. 41.)  Dr. Leigh said it affects his skin and that there were a few references to his brain, but that it was not generalized or pulmonary.  (*Id.*)  The attorney also asked whether it would be apt to consider sarcoidosis under listing 14.02 for Lupus.  (*Id.*)  The ME explained that consideration of such a listing would not be appropriate because there was no evidence Jackson had an autoimmune disorder.  (*Id.*)

### D.    Claimant's Testimony

Jackson's hearing was scheduled to begin at 9:00 a.m. on November 22, 2010. (R. 33.)  Jackson arrived forty minutes late to the hearing.  (R. 37.)  His testimony began after the ME's testimony, which started at 9:30 a.m.  (R. 33.)

At the time of the hearing, Jackson was forty-two years of age.  (R. 42.)  He is divorced and currently resides with his father.  (*Id.*)  His nephew drove him to the hearing because he has not driven since 2007.  (*Id.*)

The ALJ asked Jackson if he has suffered any seizures since October 2009.  (R. 42.)  Jackson explained that he had a seizure in August 2010, after which he was transported via ambulance to Mercy Hospital, where he underwent an electrocardiogram and a bone marrow test.  (R. 43, 45.)  Earlier in 2010, Jackson was admitted to Providence Hospital for seizure activity.  (R. 45.)  He was treated quickly and released the same day.  (*Id.*)  He said his Dilantin and Tegretol levels were low and fluctuating, and that he was prescribed 750 milligrams of Keppra.  (R. 45-46.)  At the time of the hearing, Jackson was still taking Tegretol and Dilantin, and he testified he

was compliant with his medications.  (R. 44.)  He last saw a doctor two weeks prior to the hearing to discuss his medications.  (*Id.*)

Jackson testified that the last time he used heroin was about a year before the hearing.  (R. 46.)  He stopped drinking alcohol a month prior to the hearing when he was put on a new medication.  (R. 46-47.)  Prior to that, he drank alcohol occasionally at social events.  (R. 47.)

Claimant testified that he worked in construction in 2007.  (R. 47.)  He worked as a roofer for eight to nine hours a day.  (R. 48.)  He lifted between twenty to twenty-five pounds.  (*Id.*)  He did not supervise any other individuals.  (R. 49.)

Next, claimant's attorney questioned Jackson about his limitations.  Jackson explained that the lesion on the back of his head causes him to forget things, such as his medication schedule.  (R. 49.)  Jackson also testified that he goes to the hospital every time he has a seizure because they typically occur in succession.  (*Id.*)  He also described having shaking hands and bad nerves every day.  (R. 49-50.)  Jackson noted that his sarcoidosis affected his vision, saying he almost went blind in 2003.  (R. 50.)  At the time of the hearing, however, he only saw little black spots.  (*Id.*)

When asked to put aside his memory problems, claimant said he would still have difficulty working because he cannot stand on his feet very long.  (R. 50.)  His right leg often becomes numb and he feels a tingling sensation in his toes.  (R. 50-51.)

Claimant's attorney then asked claimant what he does on a daily basis.  (R. 51.)  At that time, the following exchange transpired between claimant's attorney and the ALJ:

> **Counsel:**  What do you do all day?

**ALJ:** Counsel, we don't have time for those questions. We need to move on. You can submit something in a brief. We have to -- one more question.
**Counsel:** Oh, okay. Well, I'll just leave it at that or ask for a supplemental hearing, Judge.
**ALJ:** For a supplemental hearing?
**Counsel:** Right.
**ALJ:** On what basis, what line of questioning are you missing?
**Counsel:** Well, I, I don't know, daily activities and also more about the medical condition.
**ALJ:** I think we have enough testimony here. I'm comfortable with this. Let's go on. I'd like to ask some questions of the vocational expert. (R. 51.)
**Counsel:** Okay.

(R. 51.)

At the end of the hearing, ALJ Cromer agreed to leave the record open for fourteen days for claimant to submit an updated daily activities report and additional medical records, all of which she said she would consider in determining whether another hearing was necessary. (R. 57.) On December 2, 2010, claimant's counsel sent a one-page letter to ALJ Cromer enclosing additional medical records and again requesting a supplemental hearing in order to further develop Jackson's testimony. (R. 262, 530-35.) The letter did not include an updated daily activities report. (R. 262.)

**E.  Vocational Expert's Testimony**

Vocational Expert ("VE") Michelle Peters also offered testimony at the hearing. She first classified Jackson's past work in roofing as a skilled occupation and medium in physical demand. (R. 53.) The ALJ asked VE Peters to consider a hypothetical individual of the claimant's age, education, and work experience, who could perform a light level of exertional work; could occasionally push or pull with the upper left extremity; could never crawl or climb ladders, ropes or scaffolds; could only occasionally reach with the left arm, but never overhead with the upper left arm; and should avoid

concentrated exposure to moving machinery, unprotected heights, and commercial driving. The individual was further limited to a low stress job that was simple, routine, and repetitive in nature, and involved only occasional interaction with the public, co-workers, and supervisors. (R. 53-54.) When asked wither such an individual could perform Jackson's past work, VE Peters responded in the negative. (R. 54.)

However, VE Peters testified that such an individual could perform other work, including in inspection positions (1,000 jobs in the region, 150,000 nationally), sorting positions (900 regionally, 50,000 nationally), or assembly positions (900 regionally, 130,000 nationally). (R. 54-55.) VE Peters explained that these jobs were a representative sample, and not the only jobs the hypothetical individual could perform. (R. 55.)

ALJ Cromer then adjusted the hypothetical, asking whether the individual could perform any of Jackson's past work if, due to difficulties in concentration, persistence and pace, he would be off task more than twenty percent of the work day. (R. 55.) VE Peters testified that this individual would not be able to perform any of claimant's past work. (*Id.*) When asked whether there was other work the individual could perform, VE Peters said such an individual could not sustain competitive employment. (R. 56.)

The claimant's attorney asked whether, under the first hypothetical, the individual would be able to perform the jobs cited by VE Peters if he was unable to retain skills on a day-to-day basis. (R. 56.) VE Peters said the individual could not sustain employment if he was unable to retain the ability to do simple, repetitive tasks. (*Id.*) The VE further testified that an individual who was absent from work two or three times per month due to seizure activity, medication, or any type of condition would be unable

15

to maintain employment.  (R. 56-57.)

## II.  LEGAL ANALYSIS

### A.  Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)).  We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872.  The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985).

16

**B.     Analysis under the Social Security Act**

In order to qualify for SSI, a claimant must be "disabled" under the Act.  A person is disabled under the Act if he or she is unable "to engage in any substantial activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski*, 245 F.3d at 885-86.  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

Here, the ALJ applied this five-step analysis.  At step one, the ALJ found that Jackson had not engaged in substantial gainful activity since April 21, 2009, the application date.  (R. 20.)  At step two, the ALJ concluded that the claimant had the following severe impairments: a seizure disorder, sarcoidosis, hypertension, and left shoulder problems.  (*Id.*)  At step three, the ALJ determined that Jackson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

17

Next, the ALJ assessed Jackson's RFC and concluded that Jackson had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b) with additional limitations.  (R. 20-23.)  Specifically, the ALJ found that Jackson was limited to only occasional use in pushing, pulling, and reaching with his left arm, but must avoid overhead reaching with the left arm; should avoid crawling, climbing of ropes, ladders and scaffolds; and should avoid any commercial driving or exposure to unprotected heights and dangerous machinery.  (R. 20-21.)  Based on the RFC, the ALJ decided at step four that Jackson was unable to perform his past relevant work in construction.  (R. 23.)  However, at step five, the ALJ determined that considering Jackson's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that he could perform, including those involving inspection, sorting, and assembling.  (R. 24.)  As a result, ALJ Cromer concluded that Jackson had not been under a disability from April 21, 2009 through the date of her decision.  (R. 24-25.)

Jackson now argues (1) that the ALJ erred by failing to consider his obesity a severe impairment, and (2) that he was denied a full and fair hearing by ALJ Cromer because his opportunity to testify concerning his impairments was limited.  In connection with the latter argument, claimant also argues that the ALJ failed to properly assess his credibility.  We address each argument in turn below.

### C.    The ALJ's Failure to Consider Jackson's Obesity Was Harmless Error.

Jackson argues that the ALJ committed reversible error by failing to consider his obesity at any step of the sequential evaluation.  The Commissioner counters that any

error the ALJ committed by not addressing Jackson's obesity, which he raises for the first time at this stage of the proceedings, was harmless.  We agree.

An ALJ should consider the effects of obesity together with an applicant's underlying impairments, even if the individual does not claim obesity as an impairment. *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006) (*citing* Social Security Ruling ("SSR") 02-1p, 2000 WL 628049)).  Where the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or body mass index, the ALJ may ask a medical source to clarify whether the individual has obesity.  SSR 02-1p, 2000 WL 628049, at *3. However, in most cases the ALJ will use her judgment "to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity." *Id.*  Where a claimant does not specifically claim obesity as an ailment, "the references to his weight in his medical records [are] likely sufficient to alert the ALJ to the impairment." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

In any event, even if an ALJ fails to explicitly address a claimant's obesity, that failure may be harmless if the ALJ adopted "the limitations suggested by the specialists and reviewing doctors" who were aware of the condition, and if the claimant fails to "specify how his obesity further impaired his ability to work." *Prochaska*,  454 F.3d at 736-37 (*quoting Skarbek*, 390 F.3d at 504).

Here, although the ALJ did not explicitly address Jackson's obesity, she specifically predicated her decision upon the opinions of physicians who did discuss his weight, in particular Dr. Shah, who described the claimant as "mildly obese."  (R. 423.)

A number of other medical reports relied upon by the ALJ also indicated Jackson's height and weight. (*See, e.g.,* R. 22, 370); *see also Hisle v. Astrue*, 258 Fed. Appx. 33, 37 (7th Cir. 2007) ("This court has repeatedly excused the harmless error of an ALJ who fails to explicitly address a claimant's obesity but arrives at a final decision after reviewing the medical opinions of physicians familiar with the claimant's obesity.").

Further, no medical opinion in the record identified Jackson's obesity as significantly aggravating his other ailments. Nor has Jackson himself offered any other evidence suggesting that his obesity exacerbated his physical impairments. *See Skarbek*, 390 F.3d at 504. For all of these reasons, any error on the ALJ's part in failing to explicitly address Jackson's obesity was harmless and remand is not required on this issue.

### D. Although the ALJ did not Violate Jackson's Due Process Rights, the ALJ did Fail to Properly Assess His Credibility.

Jackson argues that his due process rights were violated because he was denied a full and fair hearing when the ALJ prevented him from testifying fully regarding his impairments. In the same section of his brief, Jackson also argues that the ALJ failed to properly assess his credibility. The Commissioner responds that Jackson's procedural due process rights were not violated because Jackson was late to the scheduled hearing and failed to provide a post-hearing updated daily activities report or brief outlining why a supplemental hearing was necessary. The Commissioner does not respond to the issue of the ALJ's credibility assessment. Although we conclude that Jackson's due process rights were not violated here, we do agree that the ALJ's credibility determination was flawed and independently requires remand.

Due process requires that a Social Security disability claimant be offered a "full and fair" hearing. *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) (*citing Richardson v. Perales*, 402 U.S. 389, 401-02 (1971)). Inherent in this requirement is that "a claimant receive meaningful notice and an opportunity to be heard." *Pitts v. Astrue*, No. EDCV 11-230-OP, 2011 WL 5520319, at *4 (C.D. Cal. Nov. 10, 2011) (*citing Udd v. Massanari*, 245 F.3d 1096, 1099 (9th Cir. 2001)). While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). However, the ALJ is afforded discretion as to how much evidence is needed and what measures are necessary to develop such a record. *Nelms*, 553 F.3d at 1098; *Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011). Moreover, "[p]articularly in counseled cases, the burden is on the claimant to produce some objective evidence that further development of the record is required." *Poyck*, 414 F. App'x at 861.

Here, it is undisputed that Jackson received notice of the date and time of his hearing. Despite this notice, Jackson appeared forty minutes late on the morning of his hearing. Understandably, and with a full docket, the ALJ did not allow Jackson to testify ad nauseam. Instead, after taking some testimony from Jackson, the ALJ told Jackson and his attorney that she would keep the record open so that Jackson could submit any additional medical evidence, an updated daily activities report, and a brief summarizing why a supplemental hearing was appropriate. Although the claimant did submit additional medical records and a letter containing a request for a supplemental hearing, he did not tender an updated daily activities report or more than a conclusory argument as to why a supplemental hearing was required.

Like the Commissioner, we distinguish this case from *White v. Barnhart*, 235 F. Supp. 2d 820 (N.D. Ill. 2002), upon which Jackson relies. There, the District Court ordered remand after the claimant failed to appear at his administrative hearing, but had offered good cause for not doing so, namely his work schedule. *Id.* at 829; *see also*, 20 C.F.R. § 404.936. We disagree with claimant that the *White* case sets forth the broad proposition that post-hearing submissions can never substitute for in person testimony. And here, Jackson never attempted to re-schedule his hearing upon receiving notice and has not offered any explanation for his tardiness. On this record, we cannot conclude that Jackson's due process rights were violated when the ALJ cut his testimony short at the hearing, where Jackson failed to provide an updated activities of daily living report or specifically explain what necessitated a supplemental hearing.

Notwithstanding our finding as to due process, we conclude that the ALJ did err in assessing Jackson's credibility. It is well-settled that an ALJ's credibility determination is afforded a special degree of deference because the ALJ is in the best position to evaluate credibility. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). Thus, an ALJ's credibility finding is overturned "only if it is so lacking in explanation or support that [it is] patently wrong." *Id.* To evaluate credibility, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* (*quoting* SSR 96-7p, 1996 WL 374186, at *4). The ALJ should consider a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and functional limitations. *Simila*, 573 F.3d at

517; SSR 96-7p, 1996 WL 374186, at *3.  The ALJ's credibility finding "must be grounded in the evidence and articulated in the determination or decision."  SSR 96-7p, at *4.  It "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.*

Here, ALJ Cromer utilized the recently criticized boilerplate statement that the claimant's allegations "concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  *See Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012).  Unfortunately, the ALJ offered little more in the way of a credibility analysis.  While the preceding paragraphs of the ALJ's opinion include certain medical evidence, the ALJ did not sufficiently specify how the evidence undermines Jackson's credibility or which allegations the ALJ found to be incredible.

More importantly, to the extent that the ALJ may have based her credibility determination on Jackson having never experienced a seizure in the presence of medical professionals, (*see* R. 22), this is repeatedly contradicted by the record itself.  As discussed above, the medical records reveal that on October 12, 2007, Jackson had two seizures in the emergency room at West Suburban Hospital.  (R. 335, 339, 342-43.)  On July 27, 2009, Jackson also had a seizure while in the waiting room at Stroger and had a repeat seizure once he was in the emergency room.  (R. 442.)  Then on October 6, 2009, Jackson experienced a seizure in the presence of an EMS crew, and another seizure upon admission to the hospital.  (R. 490-91, 494.)  Further, the ALJ commented on Jackson's possible non-compliance with medication (R. 22), but failed to address ME

23

Leigh's testimony that Jackson's low levels of medication may have been the result of abnormalities or variances in processing Tegretol or the cost of the medication.

For these reasons, we conclude that the ALJ failed to properly assess Jackson's credibility. On remand, the ALJ shall take care to consider Jackson's daily activities, the location, duration, frequency, and intensity of his pain, factors that precipitate and aggravate the symptoms, treatment that Jackson receives or has received for relief of pain or other symptoms, and any other factors concerning Jackson's functional limitations and restrictions due to pain or other symptoms.

**III.    CONCLUSION**

For the reasons set forth above, the claimant's motion for summary judgment [20] is granted in part and denied in part and the Commissioner's cross-motion for summary judgment [24] is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.


**ENTERED:**


**MICHAEL T. MASON**
**United States Magistrate Judge**


**Dated: August 28, 2013.**